In the Matter of John A. Bal, Jr., Petitioner, v Patrick V. Murphy, as Police Commissioner of the City of New York, Respondent.

First Department, December 16, 1976

*Barry Berkman (Thomas Silbiger* with him on the brief), attorney for petitioner.

*Diane R. Eisner* of counsel (*L. Kevin Sheridan* with her on the brief; *W. Bernard Richland, Corporation Counsel),* for respondent.

Lane, J. In this article 78 proceeding transferred to the Appellate Division, we are called upon to review a determination of the Police Commissioner, dismissing the petitioner, John A. Bal, Jr., from the police force.

Two aspects of this administrative determination are subject to judicial review. We must first determine whether the findings of fact of the commissioner regarding charges and specifications against Bal are supported by substantial evidence (CPLR 7803, subd 4; 7804, subd [g]). If they are, we are then empowered to review the propriety of the punishment imposed (CPLR 7803, subd 3).

The evidence at the hearing was that Patrolman Bal was on a special embassy patrol on May 11, 1971. His duties were to follow Russian Embassy cars for a distance of from 10 to 15 blocks to make sure that they were not subject to harassment. After he ascertained that the cars were not being followed by unauthorized vehicles, he could then stop following them and return to further embassy patrol. On the date in question (that is, May 11, 1971), Patrolman Bal had just broken away from following a Russian embassy vehicle. He was near the Bethesda Fountain in Central Park when he noticed two handicapped girls attempting to flag a taxicab. He apparently observed them for about 10 to 15 minutes, after which time he went over to them and offered to drive them outside the park. Conspicuously absent was an explanation by Bal as to why he remained in the park for that 15-minute period.

By this time, while it was not dark, the sun had begun to set. The girls accepted the ride but requested that they be taken to the Tavern on the Green, a restaurant at the edge of Central Park, to rejoin their classmates. The girls had been on an outing and had fallen behind the rest of their classmates. Patrolman Bal dropped them off at the Tavern on the Green and entered the premises to use the toilet facilities. As he was leaving, one of the girls noticed him and invited him to join them at a table with them and their teacher. He refused a drink which was offered to him by one of the girls at the table. After a few moments, the assistant manager of the restaurant called Bal aside and asked him to leave because he was in uniform, and he was prohibited from sitting at a table in the cocktail lounge. Patrolman Bal declined to accept this advice and continued to sit at the table. The assistant manager then observed a police sergeant on the premises, told him what had happened, and asked him to have Patrolman Bal removed. The sergeant asked Bal to accompany him to the lobby. Bal did not respond promptly, but he did ultimately go to the lobby. When questioned by the sergeant as to why he was there, Bal replied by asking the sergeant why *he* was on

the premises. Patrolman Bal then was directed by the sergeant to present his memo book. Patrolman Bal withdrew his memo book and began making an entry in it and was directed by the sergeant to stop making any further entries. Bal also requested to see the sergeant's memo book.

The sergeant also noted that Patrolman Bal had a girl's bicycle in the back seat of his patrol car, which was also unauthorized. This incident was the basis of the 10 specifications filed against Patrolman Bal. They alleged, *inter alia,* that the patrolman transported unauthorized personnel in an unmarked radio motor-patrol car; that he failed to notify the radio dispatcher of the unauthorized personnel in the car; that he entered the Tavern on the Green not for immediate police purposes, nor for taking a meal; that he sat down at a table in the cocktail lounge while in uniform with five females; that without just cause he refused to leave premises after being asked to leave by the assistant manager of Tavern on the Green; that he failed to promptly obey an order of a superior; that he failed to promptly obey the order to present his memo book; that he proceeded to make entries in his memo book after being directed to stop; that he stored a girl's bicycle in the rear seat of his car; and that he wrongfully asked to see the sergeant's memo book.

After a review of all the evidence adduced at the hearing, the trial commissioner found that Patrolman Bal was guilty of all the specifications except for the one which alleged that he entered the Tavern on the Green for no valid purpose. The trial commissioner found that Patrolman Bal had entered the Tavern on the Green for the purpose of using the toilet.

The Police Commissioner, after reviewing the trial commissioner's findings, specifically accepted and approved all of the recommendations of the trial commissioner with regard to the guilt or innocence of each specification in the case. That approval included the finding that Patrolman Bal had unauthorizedly transported nonpolice personnel in his automobile. The only caveat added by the police commissioner was that the charge of transporting unauthorized persons "should not be considered with severity," but not that Patrolman Bal was not guilty of transporting unauthorized persons.

Interestingly enough, the evidence adduced indicated that Patrolman Bal had at least a 10-15-minute hiatus, during which time he was observing the girls attempting to flag a taxicab. He made no attempt to radio headquarters for per-

mission to transport these two girls from the park to a location outside the park, though he apparently had ample time to do so.

We further note that our dissenting brother does not dispute any of these findings of fact, and therefore we may safely conclude that this court is in unanimity in confirming that the findings of fact of the trial commissioner, subscribed to by the Police Commissioner, were based on substantial evidence. We now may address ourselves to the second prong of review; namely, the propriety of the punishment imposed.

An administrative agency, in imposing sanctions against an errant employee, is free to consider the prior record of that employee in determining the punishment to be imposed. In the case at bar, both the trial commissioner and the Police Commissioner in fact did review the prior record of Patrolman Bal.

Bal's record contained mention of three citations for "excellent police duty" and one citation for "meritorious police duty." However, the balance of his record reveals instances of insubordination and pejorative attitudes towards fellow officers and superiors, sometimes in the presence of civilians.

The common theme of these charges is that Bal has been unable to adapt to the strict discipline required of policemen, especially with regard to the command system of the Police Department. We must also note that the medical record of Patrolman Bal indicated that he was on leave for non-line-of-duty injuries and illnesses for about 20% of his possible working days on the force.

Our confirmation of the determination of the Police Commissioner does not impugn the sincerity or integrity of petitioner Bal. It does, however, highlight the importance and the necessity of strict discipline in the Police Department, a quasi-military organization, and Bal's apparent inability to conform to that need.

Taking all of these matters into consideration, we do not find that the sanction imposed (namely, dismissal from the Police Department) is "so disproportionate to the offense, in the light of all the circumstances as to be shocking to one's sense of fairness" (Matter of Stolz v Board of Regents, 4 AD2d 361, 364; Matter of Pell v Board of Educ., 34 NY2d 222, 233).

Accordingly, the determination of the Police Commissioner, dated February 2, 1972, should be confirmed, without costs.

BIRNS, J. (concurring). If all that we had before us was a review of the "compassionate gesture" of Police Officer Bal, there might be unanimous support for the conclusions set forth with understandable sympathy by Justice NUNEZ.

The dismissal of Officer Bal, however, rested on broader grounds sketched in the majority's opinion affirming the Police Commissioner's order of dismissal.

In his determination, the Police Commissioner noted, in sequence, almost every act of affirmative and negative behavior encompassed in Bal's history as a police officer from his entry into the department until the day of dismissal.

There is no question but that the Police Commissioner had the right to consider the history of the petitioner in arriving at his conclusion to dismiss (Matter of Pell v Board of Educ., 34 NY2d 222, 240; Matter of Slominski v Codd, 52 AD2d 762). The Police Commissioner summarized his view in the following words: "Patrolman Bal's disciplinary record shows that he is, indeed, unwilling to accept the responsibilities required of a member of the force."

Our dissenting brother refers to the testimony of Detective Serpico as a character witness in petitioner's behalf; that the petitioner and Detective Serpico had met often to discuss Police Department matters, and "[w]e all know that Mr. Serpico publicly denounced corruption in the Department". The necessity for this reference eludes me. In no way is it connected to the determination of the charges or punishment imposed by the Police Commissioner except by tenuous implication unsupported by the record.

In my view, it is unwarranted even to imply, that the discharge of petitioner was provoked by his friendship with Detective Serpico and their common denunciation of bribery, and any such implication should be rejected.

Unless the penalty imposed shocks the conscience so as to require judicial intervention (Matter of Pell v Board of Educ., supra, p 233; Matter of Stolz v Board of Regents, 4 AD2d 361, 364), we must remember that managerial responsibility in imposing appropriate punishment, as discipline requires, is that of the Police Commissioner and not that of the courts.

NUNEZ, J. (dissenting). Joanne Wilson is a victim of polio, scoliosis and arthritis. She walks haltingly and with the aid of a cane. Her disability is so marked that she has been granted a special parking permit by the Police Department.

Alana Shelare is a victim of cerebral palsy, has deformed hips and has difficulty keeping her balance. When she becomes nervous her muscles tighten up and she falls.

On the afternoon of May 11, 1971, Joanne and Alana went on a holiday with their teacher and their college class to Central Park. Due to their handicaps, they fell behind their fellow students while on their way to the Tavern on the Green, a restaurant located also in Central Park. Alana fell twice on that day. Her hand was bleeding. Both girls attempted to hail a taxicab in order to rejoin their fellow students at the tavern. Patrolman John Bal, Jr., in uniform and driving an unmarked police car, observed the two girls unsuccessfully attempting to flag down a taxi. Upon learning of their plight, he drove them to the Tavern on the Green.

And for this "compassionate gesture" to quote the Police Commissioner, Patrolman Bal has been dismissed from the force!

In his decision dismissing the patrolman, the Police Commissioner said: "Bal's act in picking them [the two girls] up, while technically improper, could be viewed as a compassionate gesture. It is events that occurred after this act that lead me to consider this a serious case and to consider Patrolman Bal's overall fitness to remain a member of this Department." Let us consider what occurred: after taking the two girls to the Tavern on the Green, the patrolman left. Shortly thereafter he returned to use the facilities for a "personal" reason. While on his way out he was hailed to the table where the two girls were with other students. Their teacher thanked Bal for his kind gesture towards two of her students. While he sat at the table, he did not eat or drink anything. An employee of the restaurant informed Bal that they could not serve him (although no request to be served had been made). Bal said he would leave. It appears that there was a sergeant who had entered the restaurant through a back door and who was in the kitchen. This sergeant learned of Bal's presence in the dining room while in full uniform. He approached Bal and requested that Bal follow him out into the lobby. In the lobby, the sergeant requested to see Bal's memorandum book. Bal dutifully and properly obeyed the sergeant's orders. But two of the specifications of which he has been found guilty are that he did not obey the sergeant's requests *promptly*. And this in the face of Bal's offer to the sergeant to apologize if he had offended him in any way!

And what about his "overall fitness" to remain in the department? He had been on the force for approximately three years, and while he had been found guilty of a substantial number of minor infractions, he had received three excellent and one meritorious citations.

One other factor disturbs me greatly. Detective John Serpico, of Knapp Commission fame, was called as a character witness by Bal. Serpico testified that he knew Bal well and that they had often met to discuss Police Department matters. We all know that Mr. Serpico publicly denounced corruption in the department. The sergeant testified that he had "heard" of Bal. The Police Commissioner said of Bal: "He believes that his intentions are basically good and that the Department is in need of reform. He should not be faulted for his intentions or his beliefs, which are not without merit. His personal integrity and sincerity are unquestioned." Bal shared with Serpico a belief and concern for reform in the Police Department. I cannot help but wonder whether this was a factor in the sergeant's aggressive attitude towards Bal and in his dismissal.

The Police Commissioner stated that he was dismissing Bal because he had regularly failed to live up to the requirements of discipline that police work demands and because Bal had shown a disdain for supervisory authority. But Bal was not so charged. Not a word in the accusations against him about lack of discipline or disdain for supervisory authority, except possibly the charge of not having *promptly* obeyed the sergeant's orders to follow him into the lobby and to *promptly* show him the memorandum book.

Bal's acts constituted violations, but they were technical in nature and were not acts of moral turpitude. *Matter of Stolz v Board of Regents* (4 AD2d 361, 364) held that under CPLR 7803 (subd 3), a court could "set aside a determination by an administrative agency[,] only if the measure of punishment or discipline imposed is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness." This position was approved in *Matter of Pell v Board of Educ.* (34 NY2d 222, 234) "a result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened

by the derelictions of the individuals. Additional factors would be the prospect of deterrence of the individual or of others in like situations, and therefore a reasonable prospect of recurrence of derelictions by the individual or persons similarly employed. There is also the element that the sanctions reflect the standards of society to be applied to the offense involved." The court in *Pell* continued by distinguishing instances of moral turpitude from those in which there is an absence of moral turpitude or grave injury to the agency or the public. In the latter situation, within which falls the case at bar, consideration of the length of employment, loss of retirement benefits, and the probability that the dismissal may leave the employee without any alternative livelihood play a role. Petitioner's dismissal falls within the tests noted in *Pell* as evidencing discipline which shocks one's sense of fairness. Dismissal is disproportionate to the misconduct and the harm it caused the department and the public; dismissal is not a proper method to deter recurrence of minor infractions.

While *Pell* allows, after a finding of guilt, consideration of the person's prior record as an aid to determine the proper punishment, such consideration herein does not justify petitioner's dismissal.

Mr. Bal's dismissal for minor technical violations is apparently not shocking to my brethren's sense of fairness but it is most shocking to mine. Under the *Pell* standards the dismissal should be annulled and the matter remanded to the Police Commissioner for imposition of less drastic punishment.

LUPIANO, J. P., and CAPOZZOLI, J., concur with LANE, J.; BIRNS, J., concurs in an opinion in which LUPIANO, J. P., and CAPOZZOLI, J., also concur; NUNEZ, J., dissents in an opinion.

Determination of the respondent dated February 2, 1972 confirmed, without costs and without disbursements, and the petition dismissed.